# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 10 2019, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Marion County Public Defender
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Timothy Patton, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | April 10, 2019 <br><br> Court of Appeals Case No. 18A-CR-2045 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Grant W. Hawkins, Judge <br><br> Trial Court Cause No. 49G05-1702-F1-6484 |

**Bailey, Judge.**

# Case Summary

[1] Timothy Patton ("Patton") challenges his sentence for his convictions, following a bench trial, of four counts of rape, as Level 1 felonies;[1] attempted rape, as a Level 1 felony;[2] criminal confinement, as a Level 5 felony;[3] kidnapping, as a Level 5 felony;[4] strangulation, as a Level 6 felony;[5] domestic battery resulting in moderate bodily injury, as a Level 6 felony;[6] and battery resulting in moderate bodily injury, as a Level 6 felony.[7]

[2] We affirm in part, reverse in part, and remand with instructions.

# Issues

[3] Patton raises the following two restated issues:

> I. Whether his sentence is inappropriate in light of the nature of the offenses and his character.

---

[1] Ind. Code § 35-42-4-1(a) & (b).

[2] *Id.*; I.C. § 35-41-5-1.

[3] I.C. § 35-42-3-3(a) & (b)(1).

[4] I.C. § 35-42-3-2(a) & (b)(1).

[5] I.C. § 35-42-2-9(b).

[6] I.C. § 35-42-2-1.3(a) & (b)(3).

[7] I.C. § 35-42-2-1(c)(1) & (e)(1).

II.    Whether the trial court erred when, due to double jeopardy concerns, it merged two lesser-included offenses rather than vacating them.

# Facts and Procedural History

[4]    Patton and C.L. met while training at Giordano's in April or May of 2016 and began dating a month or two later. In June 2016, Patton and C.L. began living together, and Patton began to physically abuse C.L. On June 4, 2016, Patton slapped and choked C.L. multiple times, leaving C.L. bruised and scratched. On August 7, 2016, C.L. awoke to Patton slapping her face, and Patton then wrapped his hands around her throat. Patton's attack lasted approximately one hour. C.L. had difficulty breathing, and Patton's attack resulted in bruises, a black eye, and scratches all over her face and neck. Patton attacked C.L. again on September 22, 2016. He slapped C.L., grabbed her by her hair, dragged her around, and hit and strangled her. C.L. lost consciousness for a short time. As a result of that attack, C.L. had a swollen face and scratch marks on her neck.

[5]    On December 11, 2016, Patton and C.L. were staying at a motel, and Patton attacked C.L. again. Patton returned to the motel room from a bar and banged on the window of the room to try to wake C.L. so that she could let him in. Once C.L. awoke, they argued. Patton hit and choked C.L. and attempted to force her to perform oral sex on him. Patton told C.L. that she was going to perform oral sex whether she wanted to or not and required her to remove her clothes. At some point police arrived at the scene, but Patton did not allow C.L. to get dressed when she answered the door. The police handcuffed Patton

and instructed C.L. to get dressed. As C.L. was searching for her cell phone, Patton kicked her while he was still handcuffed, and she fell backwards. As a result of the attack, C.L. was bruised and her shirt was ripped.

[6] C.L. did not testify against Patton regarding any of the first four attacks because Patton persuaded her not to do so. Thus, Patton's charges for domestic battery, battery, strangulation, and criminal confinement—among other charges—that had been filed because of the June 2016 and September 2016 incidents were ultimately dismissed.

[7] In February of 2017, Patton attacked C.L. again. On the night of February 13, Patton and C.L. had another argument. C.L. became uncomfortable with the situation and contacted the police, who arrived and suggested to Patton that he leave for a while. After Patton and the police left, C.L. wedged knives in the front door to prevent or forestall Patton's reentry.

[8] C.L. fell asleep and, at approximately 5:00 a.m. on February 14, she awoke to a loud noise. C.L. heard Patton running up the stairs. Patton entered the bedroom, slapped C.L.'s face, and said that she would die that day. Patton dragged C.L. by her hair to the front door and closed it, then dragged C.L. by her hair as he returned to the bedroom upstairs. Patton had a pen and told C.L. that he was going to shove it up her nose and into her brain to kill her. C.L. fought back, grabbed the pen, and threw it. When C.L. fought back, Patton hit her in the face and choked her. Patton continued to hit C.L., who kept trying to move away. Patton had what C.L. believed was a "crazy look in his face," and

she had never seen him that way before. Tr. Vol. II at 51. Patton continued to tell C.L. that she was going to die that day. C.L. believed Patton was serious, and she was very scared. At some point during the attack, Patton placed his hands around C.L.'s neck and squeezed it tightly, which made it difficult for C.L. to breathe. C.L. blacked out multiple times during this attack, and she had gaps in her memory.

[9] Patton told C.L. that she was going to perform oral sex on him and that he was going to have anal sex with her. After Patton's attack turned sexual, at times he would force C.L. to comply by grabbing her head or hair, and at other times C.L. would comply so that she would not be hit again. Patton repeatedly forced C.L. to perform oral sex on him, and C.L. believed she had no choice but to comply even though she told Patton "no" many times. *Id.* at 55-56. Eventually, C.L. quit telling Patton to stop because Patton hit her every time she did so. Patton forced C.L. to continue with performing oral sex, including to the point that C.L. began choking. Patton attempted to engage in sexual intercourse and anal sex multiple times throughout the attack, but although penetration occurred, he could not keep an erection for long. Patton then switched to using multiple fingers to penetrate C.L.'s anus and vagina. Patton's digital penetration of C.L. hurt her, and Patton told her that he wanted it to hurt. Patton then forced C.L. to lick his fingers. Patton also forced C.L. to perform oral sex on his anus, and C.L. complied so that she would not be hit again.

[10] Eventually, C.L. told Patton that she needed to use the bathroom. Patton allowed her to do so but said, "Bitch, don't worry about gettin' dressed … cause I'm not done with you yet." *Id*. at 63. C.L. went to the bathroom, put on a t-shirt, ran down the stairs, and fled to a nearby gas station where she called 9-1-1. From a window Patton observed C.L. heading toward the gas station, and he went after her. He caught up with her as she was on the phone with 9-1-1, but he left when he realized she was speaking to the police. Patton returned to the house and hid because he knew that he had an outstanding warrant issued in the cause arising out of his December attack on C.L.

[11] When the police arrived at the gas station at approximately 8:00 a.m., the officers took photographs of C.L. and went with her back to the house. Officer Nicholas Snow observed blood on the mattress when he entered the room. The police found Patton hiding underneath a couch. When Patton made a movement towards his waistband, the canine unit present on the scene bit him. Patton was transported to the hospital to treat the bite wound.

[12] C.L. was taken to St. Francis Hospital, where she was examined by Caroline Fisher ("Fisher"), a nurse with special training and experience in sexual assault cases. Fisher observed that C.L. had suffered multiple abrasions and bruises to her face, perforation of her eardrum, blood in her right ear, bleeding and bruising behind her left ear, bruising and abrasions to her neck such that there were too many to document separately, bruises and scratches on her chest and back, lacerations on her anus, and lacerations, a blood blister, and brown patches with multiple areas of broken blood vessels in and on her vagina and

cervix consistent with blunt-force trauma. Fisher could not complete a full exam of C.L.'s cervix because C.L. was in too much pain, which is rare in Fisher's experience. Fisher explained at trial that the bruising behind C.L.'s left ear was a "battle sign;" that is, it was an injury that occurs when there has been damage to the tendon in the neck. Tr. Vol. II at 119-20. Fisher testified that victims of sexual assault often do not have visible signs of injury, but she explained that C.L. did have such signs on and in her vagina and in her anus. Fisher also testified that C.L. had injuries "consistent with being strangled" and that strangulation can lead to death. *Id*. at 120.

[13] The State charged Patton as follows: Counts I-VI, rape; Count VII, attempted rape; Count VIII, criminal confinement; Count IX, kidnapping; Count X, strangulation; Count XI, domestic battery resulting in moderate bodily injury; and Count XII, battery resulting in moderate bodily injury. Patton waived a jury trial, and his bench trial took place on July 16, 2018. The trial court found Patton not guilty on counts III and IV, but "guilty as charged" on all other counts. Tr. Vol. II at 205.

[14] At the conclusion of the sentencing hearing, the trial court stated, "[r]egarding all counts, I'm going to impose the advisory sentence." *Id*. at 219. The court therefore imposed a thirty-year sentence on each of the Level 1 felony counts, i.e., Counts I, II, V – VII. The court stated, "Count 8, Count 9, the sentence will be three years. Count 10, Count 11, Count 12, the sentence will be one year. … [S]how the sentence for Count 8 is merged with the sentences for 1, 2, 4 [sic], 5, and 6. … Show that Count 12 is merged into Count 11." *Id*. The

Sentencing Order, Abstract of Judgment, and Chronological Case Summary ("CCS") all state that the dispositions for Counts VIII and XII are "conviction merged." App. at 11-12; 14; 18. The court suspended ten years from three of the rape counts and ordered that those three counts be served consecutively. All other sentences were to run concurrently. The trial court also sentenced Patton to ten years of probation with sex offender probation for the first three of those years. This appeal ensued.

# Discussion and Decision

## Appellate Rule 7(B)

[15] Patton maintains that his sentence is inappropriate in light of the nature of the offense and his character. Article 7, Sections 4 and 6, of the Indiana Constitution authorize independent appellate review and revision of a trial court's sentencing order. *E.g.*, *Livingston v. State*, 113 N.E.3d 611, 613 (Ind. 2018). This appellate authority is implemented through Indiana Appellate Rule 7(B). *Id.* Revision of a sentence under Rule 7(B) requires the appellant to demonstrate that his sentence is inappropriate in light of the nature of his offenses and his character. *See* Ind. Appellate Rule 7(B); *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate. *Gibson v. State*, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006). We consider not only the aggravators and mitigators found by the trial court, but also any other factors appearing in the

record. *Baumholser v. State*, 62 N.E.3d 411, 417 (Ind. Ct. App. 2016), *trans. denied*. It is the defendant's burden to "persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." *Roush v. State*, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007) (alteration original). And the defendant "bears a particularly heavy burden in persuading us that his sentence is inappropriate when the trial court imposes the advisory sentence." *Fernbach v. State*, 954 N.E.2d 1080, 1089 (Ind. Ct. App. 2011), *trans. denied*.

[16] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." *Id*. at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id*. at 1224. The question is not whether another sentence is more appropriate, but rather whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[17]   We begin by noting that Patton was only given the advisory sentence for every crime for which he was convicted, and the advisory sentence "is the starting point the Legislature selected as appropriate for the crime committed." *Fuller v. State*, 9 N.E.3d 653, 657 (Ind. 2014). Moreover, the nature of his offenses was severe, brutal, cruel, and prolonged. They were not accompanied by any show of "restraint" on his part, *Stephenson*, 29 N.E.3d at 122, and they resulted in severe injury to C.L., *Cardwell*, 895 N.E.2d at 1224. His sentence is not inappropriate in light of the nature of his offenses.

[18]   Nor does Patton's character support a sentence revision. He has a criminal history, which includes convictions of crimes of violence, such as assault on a police officer. Moreover, C.L. testified that Patton had assaulted and injured her on at least four occasions prior to the violent crimes of which he was convicted in this case, and pictures of her prior injuries were admitted into evidence. In addition, at the time he committed the crimes in the instant case, Patton had a warrant out for his arrest due to a pretrial release violation related to the charges pending against him for the December 2016 incident with C.L. *See* I.C. § 35-38-1-7.1(a)(6) (providing that a court may consider recently violated conditions of pretrial release as an aggravating circumstance). All of those circumstances reflect poorly on Patton's character, and he has failed to carry his heavy burden of persuading us that his advisory sentences are inappropriate. *Fernbach*, 954 N.E.2d at 1089.

# Double Jeopardy

[19]     Patton contends that the trial court violated his state constitutional right to be free from double jeopardy[8] when it entered judgments of conviction against him for both his Level 1 felony rape charges (Counts I, II, V, VI) and his criminal confinement charge (Count VIII), and for both his domestic battery charge (Count XI) and his battery charge (Count XII). Whether multiple convictions violate double jeopardy is a question of law which we review de novo. *Bennett v. State,* 5 N.E.3d 498, 515 (Ind. Ct. App. 2014), *trans. denied*.

[20]     Entry of conviction for both an offense and its lesser-included offenses "is impermissible under both state and federal double jeopardy rules." *Wentz v. State*, 766 N.E.2d 351, 359 (Ind. 2002). The trial court held, and the parties do not dispute, that Patton's Count VIII criminal confinement charge was a lesser-included offense of his rape charges, and that his Count XII battery charge was a lesser-included offense of his domestic battery charge. Therefore, principles of double jeopardy prohibit Patton's conviction and sentencing for Counts VIII and XII. *Id*.

[21]     However, the parties disagree about whether or not the trial court actually entered convictions and sentences for Counts VIII and XII. We have previously held that,

---

[8] Article 1, Section 14 of the Indiana Constitution provides: "No person shall be put in jeopardy twice for the same offense."

> [i]f a trial court does not formally enter a judgment of conviction on a [finding] of guilty, then there is no requirement that the trial court vacate the conviction, and merger is appropriate [for purposes of double jeopardy]. However, if the trial court does enter judgment of conviction on a [guilty finding], then simply merging the offenses is insufficient and vacation of the offense is required.

*Kovats v. State*, 982 N.E.2d 409, 414-15 (Ind. Ct. App. 2013) (quotations and citations omitted); *see also Green v. State*, 856 N.E.2d 703, 704 (Ind. 2006) (quotation and citation omitted) ("[A] merged offense for which a defendant is found guilty, but on which there is neither a judgment nor a sentence, is unproblematic as far as double jeopardy is concerned."). Thus, if the trial court did not enter a judgment of conviction or a sentence on Counts VIII and XII, then it did not err in merging those two counts rather than vacating them.

[22] In reviewing sentences in non-capital cases, we "examine both the written and oral sentencing statements to discern the findings of the trial court," and we have "the option of crediting the statement that accurately pronounces the sentence." *Berry v. State*, 23 N.E.3d 854, 857 (Ind. Ct. App. 2015), *trans. denied*. Here, in its oral statement at the sentencing hearing, the trial court specifically stated that it imposed the advisory *sentences* for Counts VIII and XII, along with the other counts for which Patton was found guilty. Tr. at 219. It then stated that those *sentences* were merged with other sentences. *Id.*; *see also* Tr. at 207 (emphasis added) (court stating regarding count VIII that "he's *convicted*, but the *sentence* certainly would have to be merged"). And the written Sentencing Order, CCS, and Abstract of Judgment, all state that the *convictions* for Counts

VIII and XII are merged. App. at 11-12; 14; 18. Thus, it appears that the trial court actually convicted and sentenced Patton for Counts VIII and XII before "merging" them. That was error; because the court entered convictions and sentences for those counts, double jeopardy principles require they be vacated rather than merged. *Kovats*, 982 N.E.2d at 414-15.

# Conclusion

[23] Patton's sentence is not inappropriate given the nature of his offenses and his character. However, the trial court erred when it merged, rather than vacated, Patton's convictions for Counts VIII and XII. Therefore, we reverse those convictions and remand with instructions to the trial court to vacate them.

[24] Affirmed in part, reversed in part, and remanded.

Riley, J., and Pyle, J., concur.